I.D. ROGERS, et al., Appellants,

v.

R.J. REYNOLDS TOBACCO COMPANY, Philip Morris, Incorporated, Brown & Williamson Tobacco Corporation, Lorillard, Inc., Liggett & Myers Tobacco Co., Inc., Liggett Group, Inc., the Tobacco Institute, Inc., and the Council for Tobacco Research—U.S.A., Inc.

No. 09–87–120 CV.

Court of Appeals of Texas, Beaumont.

Oct. 6, 1988.

Rehearing Denied Nov. 22, 1988.

co Company; Philip Morris, Incorporated; Brown & Williamson Tobacco Corporation; Lorillard, Inc.; Liggett & Myers Tobacco Co., Inc.; Liggett Group, Inc.; The Tobacco Institute, Inc., and The Council for Tobacco Research—U.S.A., Inc.

I.D. Rogers, surviving husband, individually and as Independent Executor of the Estate of Marjorie Helen Rogers, Deceased, and Linda Helen Harris and Ira Claborn Rogers, the surviving children of Marjorie Helen Rogers (their deceased mother), are the Appellants.

William E. Townsley, Townsley, Dale K. Hanks, Townsley, Bush Lewis & Ramsey, Beaumont, for appellant.

Norvell Lipsonb, Benckenstein, Norvell, Bernsen & Nathan, Beaumont, Michael W. Hogue, Webster & Sheffield, Houston, John G. Bissell, Strong, Pipkin, Nelson & Bissell, Walter J. Crawford Jr., Wells, Peyton, Beard, Greenberg, Hunt & Crawford, Beaumont, Sam Cruse, Andrews & Kurth, Houston, Dale Dowell, Reinstra, Dowell & Flatten, Lawrence Louis Germer, Orgain, Bell & Tucker, Hubert Oxford, Benckenstein, Oxford, Radford & Johnson, Harold Peterson, Peterson, Petit & Peterson, Beaumont, Lea F. Courington, G.R. Poehner, David P. Stone, Moore & Peterson, Dallas, Daniel Goforth, Sewell & Riggs, Houston, Margaret L. Vandervalk, Akin, Gump, Strauss, Hauer & Feld, Dallas, Andrew C. Hartzell, Jr., and John G. Koeltl, Debevoise & Plimpton, New York City, John T. Golden, Vinson & Elkins, Houston, Herbert Dym, S. William Livingston, Jr., Richard J. DeSanti, Covington & Burling, Washington, D.C., Gene Voights, Shook, Hardy & Bacon, Kansas City, Mo., James Sandman, Arnold & Porter, Denver, Colo., William Key Wilde and Mark E. Lowes, Bracewell & Patterson, Houston, for appellees.

## OPINION

BROOKSHIRE, Justice.

Appeal from the granting of a summary judgment in favor of R.J. Reynolds Tobac-

### The Pleadings

Basically, this proceeding was a products liability suit in the District Court against six major American cigarette manufacturers. Their trade association was The Tobacco Institute, Inc., and their research and public relations organization was The Council for Tobacco Research—U.S.A., Inc. The pleadings were for money damages, arising from the lung cancer affliction and disease and the death of Marjorie Helen Rogers.

By a Second Amended Original Petition, the Appellants (Plaintiffs below) had asserted causes of action against The American Tobacco Company, alleging it to be the manufacturer of the cigarettes exclusively smoked by Mrs. Rogers. The American Tobacco Company is not a party to this appeal, it having been severed by the trial court. The Plaintiffs below alleged that the six major American cigarette manufacturers entered into an averred civil conspiracy and a concert of action. Plaintiffs' pleadings averred that the purposes of these civil conspiracies and concerts of action were to suppress and conceal certain scientific and medical information relating to cigarette smoking and resulting disease; and that, through these conspiracies and concerted actions, the Big–6 manufacturers were able to take and project a unified and uniform position on the question of cigarette smoking's relationship to disease. Also, these alleged conspiracies and concerts of actions enabled the Big–6 to take a solid, frontal position that smoking-caused

disease had not been established. Hence, Plaintiffs say, there was a failure to issue warnings in connection with cigarette and tobacco products of the Big–6.

In further averments, the Plaintiffs pleaded that, to carry out these purposes of their conspiracy and concerts of action, the tobacco companies, referred to as Big–6, formed two organizations; namely, The Council for Tobacco Research—U.S.A., Inc., and The Tobacco Institute, Inc. Further, the Rogerses aver that these two last-named organizations, along with Big–6, have carried out such purposes since the years 1954 and 1958. The Rogerses pleaded that Marjorie Rogers would likely have quit smoking timely and, thereby, would have avoided contracting lung cancer. Marjorie's cancer would not have occurred had not all of the Defendants engaged in and carried out such conspiratorial conduct. It is stipulated below that Mrs. Rogers smoked, for the purposes of this appeal, only cigarettes that were manufactured by the American Tobacco Company, which is not a party to the suit before us on this appeal.

### Personal History of Mrs. Rogers

Marjorie was born in July of 1925. She began trying cigarette smoking at about the age of 9 or 10. She was smoking regularly by age 16. From sometime in the early 1950's through 1982, Marjorie smoked from one pack to about 1½ packs of cigarettes per day.

Prior to 1966, the cigarette companies did not give any warnings that cigarette smoking could cause lung cancer or other diseases. A warning was placed on the cigarette packages in 1966. At that time, Marjorie, apparently, took some comfort in that the warning said the cigarettes *may* be harmful, rather than stating that cigarettes *are* definitely harmful.

Marjorie was diagnosed as having lung cancer in November of 1982. She was then able to, and did, quit smoking. She died of lung cancer on December 17, 1983.

### I.D. Rogers' Deposition

I.D. Rogers, by deposition testimony, stated that, *at one time*, his opinion was that Marjorie was addicted and I.D. did not think that Marjorie could quit smoking. Upon further questioning, he stated that he did not know whether or not she could quit. I.D. signed and executed an affidavit in which he swore that he and Marjorie had no idea that his wife's risk of dying from cigarette smoking was 25% or possibly higher and that, if they had been informed of this high risk, then Marjorie's addiction could have been defeated. This testimony raised a genuine issue as to a material fact. *See Randall v. Dallas Power & Light Company*, 752 S.W.2d 4 (Tex.1988).

I.D. Rogers was the husband of Marjorie for over 40 years. He swore that he could not recall his wife having said, at any time, that she had read any articles indicating that there were benefits from smoking. When asked if he had seen anything that might indicate to him that there were benefits from smoking, Mr. Rogers answered that inducing young people to think that they would elevate their social life or help them be accepted in a crowd came to mind; yet, he had never seen anything specific in writing to that effect. He testified that he was not familiar with The Council for Tobacco Research—U.S.A., Inc., and that he did not recall of ever having read any materials put out by The Council for Tobacco Research (CTR). Marjorie Rogers had apparently never mentioned to her husband anything about reading any materials published by either The Tobacco Institute (TI) or The Council for Tobacco Research. Mr. Rogers was not aware of Marjorie's reading any article or written material put out, or published, by either of them. Mr. Rogers could not testify as to what ads, if any, his wife had seen or heard about when she was 8, 9, 10, 11, 12, 13, 14 or 15 years old. He could not recall any particular ads about cigarettes, whether on billboards, in magazines or otherwise, during their early married life.

In the 1960's, he did recall, at one time or another, a certain Marlboro ad with a man on a horse, with a lariat. At his deposition,

that was the only advertisement that Rogers could recall. The Marlboro ad, he said, was displayed in magazines and newspapers and he did not know if his wife had seen that particular ad. He did recall quite a number of ads in the 1970's and the 1980's, but he did not pay a great deal of attention to them and they did not affect him.

It is clear that the decedent began smoking cigarettes sometime about, or prior to, 1940, which was more than a decade before the organization of CTR (Council for Tobacco Research) or CTR's predecessor. Mr. Rogers testified that his wife had told him that she had begun smoking because older people were doing it and smoking was just the thing to do. She had heard over the radio that L.S.M.F.T., or something or other, was fine tobacco and that she just kind of picked up on that slogan. Rogers recalled that it was probably sometime in the early 60's that Marjorie felt that she should cut down on smoking. The reason was that the news media began to publicize that cigarettes were hazardous to peoples' health and she was made aware of this information; then she realized that she should cut down and she would like to quit. Rogers continued:

"A. . . . but she was addicted to it and I feel like that she was just unable to quit."

"Q. If your wife had really wanted to quit, really decided I want to quit, you don't know whether or not she could have, do you?

"A. I don't think that she could have.

"Q. But you really don't know, do you?

"A. I sure don't know."

### Dr. Richard I. Evans' Affidavit

An affidavit was signed and executed by a social psychologist, who was or is a Director of Social Psychology/Behavioral Medicine Research Group at the University of Houston. In Evans' affidavit, he stated that, in his opinion, there was a strong likelihood that Marjorie would have ceased smoking in 1965 if she had understood fully the dangerous risk of the disease and death

resulting from cigarette smoking. These risks were supported by some prevailing views at that time that were held in the medical community and the scientific community generally. We quote from Dr. Evans' affidavit:

"I have been asked by attorneys W.W. Watkins and W.E. Townsley to provide an opinion as to whether a lady by the name of Marjorie Helen Rogers would have likely quit smoking in 1965 if her understanding of the risk of disease and death from cigarette smoking had conformed to the prevailing views at that time of the medical and scientific community.

"The behavioral sciences are sufficiently developed to do a behavioral analysis of a cigarette smoker, as of 1965, to determine the likelihood that such smoker would have quit had he held beliefs of the risk of disease and death from cigarette smoking that conformed to the prevailing views at that time of the medical and scientific community. Of course, such behavioral analysis would require certain information about the cigarette smoker.

"I have asked Mr. Watkins and Mr. Townsley to furnish me certain information about Mrs. Rogers which I considered relevant, and they have furnished me the information contained in Exhibit A to this affidavit. The information contained in Exhibit A is sufficient for me to give an opinion on the submitted question.

"My opinion, as a behavioral scientist, is that there is a strong likelihood that Marjorie Rogers would have quit smoking in 1965 if at that time she had come to fully understand the risk of disease and death from cigarette smoking in accordance with the prevailing views at that time of the medical and scientific community."

### Fact Questions

A material fact question was raised that, in 1954 or 1955, five of the Big–6 manufacturers (excluding Liggett & Myers Tobacco Co., Inc., which did not join until 1964) took

the position that cigarette smoking did not cause lung cancer. Big–6 thereafter formed what was originally known as The Tobacco Industry Research Committee, now known as The Council for Tobacco Research—U.S.A., Inc. The Council for Tobacco Research—U.S.A., Inc., had the purpose of aiding and assisting research in tobacco use and its relationship to health and also to make available to the public factual information on that subject. The Appellants say that this research organization (CTR) has publicly promoted the proposition, which is the tobacco industry's position, that cigarette smoking is not injurious to health.

Then, in 1958, the Big–6 manufacturers formed a trade group called The Tobacco Institute, Inc. (TI). TI had, in general, two purposes. One was to collect and disseminate scientific and medical material relating to tobacco and to collect and disseminate information relating to the use of tobacco and health.

Appellants argue that, beginning shortly after their formation, these two organizations, CTR and TI, while acting on behalf of the cigarette manufacturers, monitored the entire world's literature on the subject of cigarette smoking and disease and, at the same time, anticipated adverse reports. Then these organizations acted to attempt to suppress such unfavorable reports, when possible. If this suppression was not possible, then the two organizations acted to challenge the reports and to dilute and diminish their influence. The Appellants further argue that these two organizations generated, or caused to be prepared, papers and articles which refuted the idea that cigarette smoking caused disease. These papers attacked any such unfavorable finding or causal relationship between cigarette smoking and disease. Some evidence of these assertions exists as to some of the parties.

*Appellants' Arguments*

Appellants, with zeal, argue that they have correctly pleaded causes of action of civil conspiracy and concert, or concerts, of actions against each of these Appellees which were based on their "group conduct." The Appellants state that they have properly pleaded causes of action against "CTR" and "TI" based on negligence, fraud and misrepresentation.

The Appellees, as the Movants for the Summary Judgments, had to state, under *TEX.R.CIV.P. 166a, sec. (c)*, the grounds for their motion in a specific manner, demonstrating conclusively that the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits before the court, established that there was no genuine issue as to any material fact and that the moving parties—the Appellees here—were entitled to summary judgment as a matter of law. *See City of Houston v. Clear Creek Basin Authority*, 589 S.W.2d 671 (Tex.1979).

The Appellants, here, interpret *Rule 166a* to the effect that the Appellees had the burden *to negate conclusively at least one of the essential elements of each of the causes of action pleaded by the Appellants*. Next, the Appellants vehemently argue that the tobacco companies failed in their burden in that they presented inconclusive evidence in support of their motions for summary judgment. Appellants maintain that the tobacco companies failed to negate the issue of causation.

Appellants argue that the summary judgment evidence of Appellees was not sufficient to conclusively negate causation because (1) it was actually contradicted by other evidence of probative force; (2) that there is a legal presumption of causation in favor of Plaintiffs and (3) the Plaintiffs came forward with affidavits which were sufficient to raise a fact issue on the question of the Appellees' group and individual conduct in concealing, suppressing and misrepresenting information on the disease hazards of cigarette smoking, thus defeating the motion for summary judgment. Appellants claim there was a failure to adequately warn Marjorie Rogers of the health hazards, one of which being lung cancer.

*Reviewing Summary Judgments When Defendants Prevail as the Movants*

The Rogerses have *pleaded* causes of action against the Appellees, as follows: (1)

The Council for Tobacco Research—U.S.A., Inc. and The Tobacco Institute, Inc., in their separate and individual capacities: (a) suit based on negligence; (b) suit based on fraud, concealment and suppression; (c) suit based on misrepresentations. The Appellants pleaded several causes of action against the Appellees in alleged "group conduct", by way of civil conspiracy or concert of action, such participants in the said "group conduct" being the Big–6 American Tobacco Manufacturers, The Council for Tobacco Research—U.S.A., Inc., and The Tobacco Institute, Inc., as follows: (a) a civil conspiracy to commit *tort* which, in turn, was grounded on (1) strict liability; that is, design defects, marketing defects and misrepresentations; (2) negligence; (3) fraud; (b) concert of action to commit the underlying torts grounded in (1) strict liability; (2) negligence and (3) fraud.

We find some evidence in this long record of negligence or intentional suppression on the part of CTR and a resulting causal connection.

A threshold question is divining the correct rules for appellate review pertaining to granted summary judgments when the Defendants—Appellees were the movants in the trial court. A basic thrust of the Appellants' suit is a cause of action for damages based on product liability against the six major American cigarette manufacturers (Big–6) and their trade association, The Tobacco Institute, Inc. (TI) and their research and public relations organization, The Council for Tobacco Research—U.S.A., Inc. (CTR), for money damages arising out of the death resulting from lung cancer affliction of Marjorie Rogers.

The Appellants argue that the purposes of the civil conspiracy, as well as concert of action, were to suppress and to conceal scientific and medical information relating to smoking and resulting disease as well as to take a uniform position on the smoking and disease issue, which position was to the effect that the scientific and medical information had not established that smoking causes disease. Dr. Evans' affidavit is to the contrary. Another purpose was to fail to issue any warnings in connection with their tobacco or cigarette products. Appellants further charge that CTR and TI acting in a conspiracy with the members of the Big–6, have, in fact, carried out these alleged purposes since 1954 and since 1958, respectively. Appellants claim that Marjorie Rogers would, likely, have quit smoking, thereby avoiding lung cancer, had these various Appellees not engaged in such conduct. We think Appellants have raised these issues under the Summary Judgment practice.

It appears that the trial court's approach was to examine—since the Plaintiffs had made certain allegations below—the record to determine whether there had been a fact issue raised as to the theories pleaded by Appellants. Stated another way, if there had been a theory presented by the Appellants, then the trial court determined if evidence existed from which it could project a "resolution of a future possibility of raising the issue." We think that approach by the trial court was erroneous.

Stated more precisely, we think that the Appellees' burden, below, was to come forward with evidence conclusively negating the existence of at least one essential element of each cause of action alleged by the Appellants. The movants for a favorable summary judgment, the Appellees below had the burden of establishing, as a matter of law, that there was no genuine issue of a material fact as to one or more of the essential elements of the Plaintiffs' various causes of action; then and only then would the Appellees be entitled to a summary judgment as a matter of law. The Appellees failed.

In *Citizens First Nat. Bank, Etc. v. Cinco Explor.*, 540 S.W.2d 292, 294 (Tex.1976), the court wrote:

"It is well established that a defendant moving for a summary judgment assumes the burden of showing as a matter of law that the plaintiff had no cause of action against him. *Gaddis v. Smith*, 417 S.W.2d 577 (Tex.1967). Thus, the question becomes whether Citizens' summary judgment proof established as a matter of law that there was no genuine

issue of material fact as to one or more of the essential elements of Cinco's cause of action. *Gibbs v. General Motors Corporation*, 450 S.W.2d 827 (Tex.1970); *Torres v. Western Casualty and Surety Company*, 457 S.W.2d 50 (Tex.1970)."

Chief Justice Calvert's opinion in *Gibbs v. General Motors Corporation*, 450 S.W. 2d 827, 828 (Tex.1970), in a lucid manner, makes a crucial distinction as to the rules applicable here, writing:

"The court of civil appeals put the question before it in this language ([*Gibbs v. General Motors Corp.*] 445 S.W.2d [589] at 590 [(1969)]):

" 'Appellants correctly assert that the primary and controlling issue involved in this case is whether the summary judgment proof *raises a fact issue* concerning defectiveness of the upper left ball-joint unit on the Gibbs pickup at the time of the accident and at the time the truck left the General Motors factory.'

"Pointing out that an essential element of appellant's case was proof that 'the ball-joint unit in question was defective at the time it left appellee's factory,' the court of civil appeals concluded (445 S.W.2d at 593):

" 'The record considered in its most favorable light to appellant *does not raise a fact issue* which would support a finding in their favor on this essential element of their case.'

"The two questions illustrate a basic fallacy frequently found in the approach of some of our courts to the matter of rendering or affirming a summary judgment in favor of a defendant. In such cases, the question on appeal, as well as in the trial court, is *not* whether the summary judgment proof *raises fact issues* with reference to the essential elements of a plaintiff's claim or cause of action, but is whether the summary judgment proof *establishes as a matter of law that there is no genuine issue of fact* as to one or more of the essential elements of the plaintiff's cause of action. The last sentence of paragraph (c)

of Rule 166–A [sic], Texas Rules of Civil Procedure, governs. It provides:

" 'The judgment sought shall be rendered forthwith if the pleadings, depositions, and admissions on file, together with the affidavits, if any, *show that*, except as to the amount of damages, *there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'*

"The provisions of Rule 166–A are applicable alike to defendants and plaintiffs who move for summary judgment; the judgment sought should be granted, and if granted should be affirmed, *only* if the summary judgment record establishes a right thereto as a matter of law." (Emphasis theirs)

It is interesting to note that the suit against *General Motors Corp., id.,* was based on the theory of strict liability. In *Gibbs, supra,* there was an affidavit of one Miller to the effect that he, Miller, did not observe any defects in the motor vehicle or in its ball-joint unit attributable to the manufacturer and that the design of that system was common throughout the automotive industry and that there were no misaligned or faulty parts and that the failure of the unit (the ball-joint unit) was a result of general wear and improper lubrication and was not the result of a defect in manufacture. The Court of Civil Appeals, in *Gibbs, supra,* held that the affidavit was proof that the plaintiffs had no cause of action under the theory of strict liability in tort because the proof showed that the defect complained of did not exist at the time the pickup left the factory. The Supreme Court, in *Gibbs,* rejected this reasoning categorically. The Supreme Court reasoned that, inasmuch as the *affidavit testimony of Miller did not establish, as a matter of law, that the defect in the ball-joint did not exist when the pickup left the factory,* the Court would not concern itself with the probative force of the summary judgment evidence tendered by the plaintiffs. The court held that the plaintiffs did not have the burden to thwart the defendant's motion for summary judgment by going forward with evidence. *See Tig-*

*ner v. First Nat. Bank of Angleton,* 153 Tex. 69, 264 S.W.2d 85 (1954). We find the Appellees in the position of General Motors Corp.

▮ The defendant-movant is required to meet the plaintiffs' causes of action, as they are pleaded and to demonstrate that the plaintiffs cannot prevail. *Cook v. Brundidge, Fountain, Elliott & Churchill,* 533 S.W.2d 751 (Tex.1976); *Glenn v. Prestegord,* 456 S.W.2d 901 (Tex.1970); *Guidry v. Neches Butane Products Company,* 476 S.W.2d 666 (Tex.1972). If the Defendants–Movants fail in their burden, then there can be no further burden upon the Plaintiffs. *Box v. Bates,* 162 Tex. 184, 346 S.W.2d 317 (Tex.1961). *Compare Guidry v. Neches Butane Products Company, supra. See and compare Bankers Commercial Life Ins. Co. v. Scott,* 631 S.W.2d 228 (Tex.App.—Tyler 1982, writ ref'd n.r. e.). Any and all reasonable inferences concerning the existence of a material fact question must be resolved against the party moving for the summary judgment and the evidence must be viewed in a light most favorable to the non-moving party. *Rose v. Enterprise Co.,* 617 S.W.2d 737 (Tex.Civ. App.—Beaumont 1981, writ ref'd n.r.e.). The function of the summary judgment practice is not to deprive a litigant of his right of trial by jury but merely to eliminate patently unmeritorious claims and untenable defenses. *See Gulbenkian v. Penn,* 151 Tex. 412, 252 S.W.2d 929 (1952).

In *City of Houston v. Clear Creek Basin Authority, supra,* the court wrote, at page 678:

"The movant still must establish his entitlement to a summary judgment on the issues expressly presented to the trial court by conclusively proving *all essential elements of his cause of action or defense as a matter of law. See Swilley v. Hughes,* 488 S.W.2d 64, 67 (Tex.1972). Summary judgments must stand on their own merits...." (Emphasis added)

### Appellees' Contentions

The Appellees succinctly and exclusively characterize this case solely as: "This is a products liability action." We cannot agree 100%. Next, the Appellees claim that Appellants' counsel *abandoned all claims against the non-supplying cigarette manufacturers* except the Appellants' claims for conspiracy and concert of action. Again, we disagree. We conclude that the basis for the Appellees' position is erroneously based on certain selected statements spoken during the oral presentation at the summary judgment hearing. We have the record of the hearing conducted on the motion. No oral evidence was taken. Notice that *TEX.R.CIV.P. 166a(c)* sets forth the basis on which a summary judgment motion is to be rendered. The oral arguments made at the presentation of the motion are not included in *Rule 166a(c)*. But, more importantly, we conclude that the Appellants did not abandon their other alleged causes of action. The Appellants' written responses and supplemental responses to the Motion for Summary Judgment demonstrate that the Appellants did not abandon their causes of action. The argument for the Appellants, made below, was to the effect that each of the manufacturers had joined together in addressing their responsibilities and duties. When the trial court asked whether the Appellants' civil conspiracy and group conduct theories also incorporated the product liability theories, Appellants' counsel answered "yes". Appellants' counsel argued, as a part of the conspiracy theory, the underlying torts of strict liability, the *Restatement of Torts 2d, sec. 402B*, misrepresentations and common law actions for negligence and fraud. Appellants' counsel made it clear, below, that the *underlying tort of strict liability was among the claims and theories argued for recovery; but it was not the sole claim.* Appellants' counsel, below, argued that his major presentation encompassed negligent and fraudulent conduct and, in addition thereto, the marketing of unreasonably dangerous products because of marketing defects, design defects and other defects and as a separate, additional theory, a civil conspiracy cause of action existed to create both joint and several liability against the non-supplying (to Marjorie) cigarette manufacturers. The Appel-

lants insisted on this civil conspiracy theory.

It is important to note that this lawsuit involves, interalia, cigarette manufacturing, advertising, selling and distributing and is distinctive in nature.

Appellees maintain that a conspiracy action cannot be maintained unless an underlying, intentional tort is shown to be the basis therefor. We disagree. *See Akin v. Dahl*, 661 S.W.2d 917 (Tex.1983). We quote from *Akin* at page 921:

> ".... However, once a civil conspiracy is found, each co-conspirator is responsible for the action of any of the co-conspirators which is in furtherance of the unlawful combination. *Carroll v. Timmers Chev., Inc.*, 592 S.W.2d 922, 926 (Tex.1979). Therefore, each element of the cause of action of malicious prosecution is imputed to each co-conspirator."

Judge Wallace then wrote that an unlawful tort such as negligence could be the object of the conspiracy and that no additional finding would be necessary as to each co-conspirator unless exemplary damages were sought. Here the Rogerses have asked for compensatory damages.

We decide that a conspiracy of the type in this case has a life of its own where the conspiracy is to engage in attractive, enticing advertisements promoting the smoking of cigarettes.

■ Appellees dogmatically state that there is no such thing as a conspiracy to commit an unintentional tort or a conspiracy to be negligent. We disagree. *See Akin v. Dahl, supra.* Appellees insist:

> "The action agreed upon pursuant to a civil conspiracy must be either a criminal act or an intentional tort."

We conclude that a defendant engaged in a civil conspiracy can be charged with legal responsibility if that defendant, with others, proceeds in a tortious manner; which is to say, that the defendant had the intention of committing a tort or merely proceeding in a negligent manner. It is only that defendant, who acts innocently and carefully and in a non-negligent way and who performs an act which happens to fortuitously further the tortious purpose of another, who (being an innocent and careful defendant) is not responsible under the theory of civil conspiracy. The label of conspiracy or civil conspiracy is frequently used in connection with vicarious liability. The law of conspiracy has developed to the extent that this term came to be used to extend liability in tort, as well as in crime, to conspirators beyond the active or original wrongdoer to those who had merely planned, assisted or encouraged the original or active wrongdoer.

■ There exists discussion and debate as to whether conspiracy is to be recognized as a separate tort in and of itself. The better-reasoned view is that the agreement—that is a mere agreement *without any further act*—to enter into a wrongful act does not amount to a tort. There must be some act committed by one or more of the parties *to advance or pursue or to implement the agreement.* Then, that active, implemented conspiracy becomes in itself, a tort.

### Dean Page Keeton and Professor Prosser

■ Professor Prosser and Dean Keeton write that where the means are employed or the purposes are accomplished, which are, in themselves, tortious, then the conspirators who have promoted the act, may be responsible for damages and can, in the proper case, be held liable. We determine that, under Texas law, there can be a conspiracy to be negligent. *See Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 857 (Tex.1969). There, the Supreme Court wrote as follows:

> " 'There must be an agreement or understanding between the conspirators to inflict a wrong against, or injury on, another, a meeting of minds on the object or course of action, and some mutual mental action coupled with an intent to commit the act which results in injury; in short, there must be a preconceived plan and unity of design and purpose, *for the common design is of the essence of the conspiracy.*' "

We conclude that a correct analysis of *Schlumberger, supra*, makes it clear that the Supreme Court was *saying only* that conspirators must intend to engage in the course of conduct that results in the injury and that the course of conduct must be known to them. The liability may then be joint. The course of conduct need not be to commit an intentional, separate, underlying tort. *Schlumberger, supra*, stands for the proposition that a person, or defendant, cannot *inadvertently become a member of a civil conspiracy*. Indeed, he or it must consciously and knowingly combine with others to engage in an intended course of conduct and perform some acts to implement the intended course of conduct and set it on its way. Thus, we conclude that the course of conduct, itself, agreed to by the civil conspirators, does not have to involve a separate, distinct intentional tort to impose civil liability. We say, concerning smoking and health problems of cigarette consumption, that a tortious breach of a legal duty can serve as an "underlying tort" or give a separate and independent life to the civil conspiracy. We decide Appellants are entitled to their day in court on the merits on this theory of recovery. *See and compare Akin v. Dahl*, 661 S.W.2d 917 (Tex.1983).

### Cigarette Smoking and Health Problems

We decide that cigarette smoking and resulting health problems are a separate, special unique type of case, sometimes referred to as sui generis.

Next, the non-supplying manufacturers argue that no one of them had any duty whatsoever to warn Mrs. Rogers, arguing that the cigarette manufacturer's duty to warn of any dangers, in its products, extends only to the actual users or consumers of that individual manufacturer's own products. Appellees cite *Restatement (Second) of the Law of Torts, sec. 388, 402A* (1965), and *Alm v. Aluminum Co. of America*, 717 S.W.2d 588 (Tex.1986). Appellees' basic position is that a single cigarette manufacturer has a duty to inform *only* the users or consumers of any hazards associated with the use of its own products and

that, under no circumstances, would a cigarette manufacturer's duty to warn, extend to the users of a competitor's product. We disagree. This rule does not apply to those cigarette manufacturers acting in an alleged conspiracy. An attractive, stimulating advertisement of one manufacturer could easily influence a person to smoke a different brand of cigarettes.

We agree with the Appellants that the law of civil conspiracy makes non-supplying cigarette manufacturers, subject to liability for failure to warn cigarette smokers of the dangers of cigarette smoking, including inhaling and ingesting the smoke, tars, ingredients and other materials in the smoke. *Pritchard v. Liggett & Myers Tobacco Company*, 295 F.2d 292 (3rd Cir.1961).

The Appellants cite *Nicolet, Inc. v. Nutt*, 525 A.2d 146 (Del.1986). The issue was whether a cause of action exists against a defendant whose asbestos products did not cause the purported injury, but who allegedly conspired with other asbestos manufacturers to actively suppress and intentionally misrepresent medical evidence of the health hazards of asbestos. The Supreme Court of Delaware held that the plaintiff's allegations sufficiently stated a tort claim based on civil conspiracy to commit fraudulent concealment.

In *Nicolet*, the court held that Nicolet was a member of a conspiracy, acting in furtherance of the conspiracy, actively suppressed data on the harmful effects of asbestos with the intent to hide such information from the plaintiffs in order to induce them to continue their exposure. The plaintiffs were injured as a result of the unlawful acts of Nicolet's co-conspirators. The court held in *Nicolet*, that liability attaches where there is active misconduct of intentionally suppressing information.

We disagree with the Appellees' contention that conspiracy theories are inapplicable in the absence of a proximate cause link between the use of a certain manufacturer's products and the injuries and damages incurred by an individual smoking a different brand of cigarettes.

It seems now reasonably established, by generally accepted, scientific research and medical opinion, that there exists a causal relationship between cigarette smoking and disease, such as lung disease.

■■■ We conclude that certain confidential reports dated in the latter part of 1954 and the middle part of 1958, inter alia, raised a genuine issue as to a material fact, being negligence on the part of CTR and its predecessor. A prominent doctor declared in general that he and certain other members were aware of attacks which had been made against the use of tobacco for many decades. He declared that he wished to build a foundation of research sufficiently strong enough to arrest continuing attacks and to arrest future attacks. We perceive this is a slanted approach. This eminent scientist also described a "master plan", spending considerable time detailing all the phases of the master plan. Furthermore, a certain Life magazine story concerning smoking had been dropped and other research projects had been discontinued. There was, of course, other evidence, we perceive, raising the issue of negligence on the part of CTR under the Summary Judgment practice.

We also perceive that there is some evidence of an intentional tort to suppress certain research projects and to cut off certain research grants. Likewise, we decide that the appropriate causal nexus to lung disease has been raised. Hence, we reverse the judgment in favor of CTR and we remand the cause for a new trial as to CTR.

In about 1954 by a first public announcement, the Big–6 (less Liggett & Myers Tobacco Company) undertook a gratuitous duty to inform the general public of all material connections between cigarette smoking and disease. Pursuant to this undertaken gratuitous duty, the manufacturers formed CTR along with its predecessor, Tobacco Industry Research Committee (TIRC). One major purpose of CTR was to eradicate charges—that CTR considered groundless—that linked cigarette smoking to disease. The executive board members of CTR were virtually all high executive officers of the Big–6 cigarette manufacturing companies. Through the executive board they continued to maintain control of the policies, programs and grants of CTR. And the Big–6 has continuously maintained this position of control by controlling the funding of the research programs and research grants that were conducted by and awarded to CTR. This connection between the Big–6 and CTR was, we perceive, very close and intertwined. Therefore, the issues raised against CTR under the Summary Judgment practice are imputed to the Big–6.

In a frank statement to cigarette smokers issued by TIRC through certain sponsors, the sponsors took the position that distinguished authorities, then unidentified, pointed out that in recent years research had indicated many possible causes of lung cancer, but that there existed no proof that cigarette smoking was one of the causes.

The sponsors took the position that they accepted an interest in the people's health as a basic responsibility which was paramount to all other considerations in their business affairs. Further, the sponsors took the position that their cigarette products were not injurious to health. The frank statement reads that many people: "have asked us what we are doing to meet the public's concern aroused by the recent reports." In substance, the sponsors and their committees pledged aid and assistance toward research efforts into all phases of tobacco use and health. It was further pledged that this joint financial aid would be in addition to that which was already being contributed or spent by the individual companies.

Under this voluminous record we think the Big–6 failed in their duty. Some of the sponsors were: The American Tobacco Company, Inc.; Brown & Williamson Tobacco Corporation; P. Lorillard Company; Philip Morris & Co., Ltd., Inc.; R.J. Reynolds Tobacco Company; and, United States Tobacco Company. There were, of course, other sponsors.

We want to stress in a dramatic fashion that there exists in this record, among oth-

er materials, 8 boxes, the dimensions of which are 15½″ in length, 12⅜″ in width, and 10⁵⁄₁₆″ in height. These boxes contain approximately 24,000 pages of exhibits. Even though the various briefs were helpful, the review of this appeal has been a horrendous job of work.

We therefore reverse the judgment in favor of: R.J. Reynolds Tobacco Company; Philip Morris, Incorporated; Brown & Williamson Tobacco Corporation; Lorillard, Inc.; Liggett & Myers Tobacco Co., Inc.; and Liggett Group, Inc.; and remand those causes for a new trial against the immediately above named tobacco companies.

A scintilla and more of evidence nudges us to think that TI took the position that filter tipped cigarettes were safer. This position was broadcast by a prominent statistician of The Tobacco Institute, Inc. However, at that time an eminent authority had written an article or articles to the effect that filter tipped cigarettes caused an increased level of carbon monoxide intake. This American doctor, the eminent authority, had reviewed certain studies that had been conducted in England. The British scientists had reported that filter tipped cigarettes had an increased level of carbon monoxide intake. The increase was estimated at about 28%. Then the American doctor conducted his own experiments and investigations.

The American doctor concluded that the smokers using filter tipped cigarettes had, in general, two to three years less life expectancy than the smokers of non-filter tipped cigarettes. This same American doctor was asked whether or not a low tar, low nicotine cigarette would be more desirable. His answer was no. He maintained, in general, that the so-called low tar, low nicotine filter tipped cigarettes would not decrease the carbon monoxide level intake since he reported there was a considerable increase of carbon monoxide intake in filter tipped cigarettes. Then in this same radio interview this same statistician for TI stated that the American doctor's studies were based on conjecture rather than valid statistics. The American doctor responded that the tobacco industry had not discover-

ed a safe cigarette. The statistician for TI responded that the American doctor's results should not be viewed with much respectability.

This American doctor in the same broadcast stated that the tobacco companies were not even interested in working on carbon monoxide and that they were not working enough on low tar and low nicotine problems. To the American doctor, in his opinion, it was much more important to work on lower carbon monoxide if the tobacco industry was really going to work on making safe or safer cigarettes. He further stated that his analysis of the situation was that the worst thing in cigarette smoking was carbon monoxide. He also maintained that there were many, many studies which showed that carbon monoxide was extremely detrimental to the cardiovascular system of both human beings and animals. His conclusion was that the tobacco industry needed to do much more toward working to eliminate carbon monoxide intake. And he further reaffirmed that based on his own study, it appeared to him that when the industry was trying to make a low tar, low nicotine cigarette that a filter was usually used which, in turn, meant that the smoker was going to have more intake of carbon monoxide which again, in turn, implied that the smoker would be subjected to more damage to his health. He stated that cigarette smoking is so bad that no one should smoke at all.

In rejoinder the statistician for TI denied many of these findings and took the position generally that carbon monoxide had no increased effect on smokers of filter cigarettes. The TI statistician suggested that smoking low tar and low nicotine cigarettes and filter tipped cigarettes did reduce the health risk to smokers. He further criticized the American doctor for publishing his results and arguments in the newspapers. The statistician finally took the position that the American doctor had reached his so-called conclusions on the basis of his, the American doctor's, own conjectures. The statistician also criticized the doctor because his studies had not been published in scientific literature, but some of the doctor's report had appeared in the *Journal of*

*Breathing.* As a final rejoinder, the American doctor stated that the standard techniques which the cigarette industry uses is to disparage all types of studies, attempting to show how bad these studies are. The implication is that since these studies normally have deficiencies, the studies are therefore invalid; and, in reality, most studies do have some deficiencies since it is very difficult to make a perfect study. The American doctor concluded that the type of study that he had made was a very valid type of study because it was based on population studies.

After reviewing the documents and materials involved, we decide that the Rogerses have a cause of action against The Tobacco Institute, Inc.

Therefore, we reverse the judgments of the trial court and remand the causes of actions against all the Appellees.

REVERSED AND REMANDED.