James R. RILEY, Mary Gray and Deep East Texas Self Insurance Fund, Appellants,

v.

TRIPLEX COMMUNICATIONS, INC., d/b/a Radio Station KZZB–95 FM, Appellee.

No. 09–92–318 CV.

Court of Appeals of Texas, Beaumont.

April 14, 1994.

Rehearing Overruled May 5, 1994.

---

Thomas A. Peterson, Peterson, Petit & Peterson, Joe Michael Dodson, Pate & Dodson, Beaumont, for appellants.

Philip Babin, III, Strong, Pipkin, Nelson & Bissell, Beaumont, for intervenor.

Charles K. Kebodeaux, Orgain, Bell & Tucker, Beaumont, for appellee.

Before WALKER, C.J., and BURGESS and BROOKSHIRE, JJ.

## OPINION

WALKER, Chief Justice.

This is a lawsuit for personal injuries brought by James R. Riley and Mary Gray, Beaumont Police Officers, who received serious personal injuries as a result of being struck by an automobile driven by a drunk driver. Officer Riley and Officer Gray, plaintiffs below, are now appealing the judgment entered by the trial court. Appellees to this appeal are Triplex Communications, Inc., and Radio Station KZZB–95 FM.

Originally, appellants filed suit against The Cowboy Palace Inc., and Vernis J. "Joey" Dartez under a dram shop theory of liability, and against Triplex Communications, Inc. and Radio Station KZZB–95 FM under theories of vicarious liability and negligent promotion. Deep East Texas Self Insurance Fund filed an intervention seeking to recover pursuant to its Workers' Compensation lien, for benefits and payments made on behalf of these two Beaumont Police Officers.

A jury found the Palace and Dartez liable under the Texas dram shop statute. The jury also found that the Palace and B–95 were not engaged in a civil conspiracy as defined by the trial court. The trial court refused to submit appellants' requested jury questions regarding joint enterprise, party to the offense under Section 7.02(a)(2) of the Penal Code, and negligent promotion. The trial court further refused to submit appellants' requested jury question and definition relating to civil conspiracy.

After overruling appellants' Motion for Judgment Non Obstante Veredicto as to Triplex/B–95, the trial court entered judgment against the Palace and Dartez, and in favor of appellant, Mary Gray, in the amount of $1,300,139.57, and in favor of appellant, James R. Riley, in the amount of $91,714.85.

The trial court overruled appellants' Motion for New Trial and appellants thereafter perfected this present appeal against Triplex and B–95.

In view of appellants' unique theories of recovery we must set forth the factual circumstances in as much detail as possible.

Factually, on June 30, 1988, a Thursday night, Joseph Wayne Stephens, Jr., chose the Palace as a place to dance, drink, and have a good time. It was KZZB–95 Ladies Night at the Palace.

For approximately seven years, the Palace and B–95 participated together in what is known as "B–95 Ladies Night at the Palace."

According to KZZB–95 FM's president and general manager, for a period of several years, the phrase "B–95 Ladies Night" became associated with Thursday nights at the Palace. Bar drinks on Thursday were 95 cents, such prices being set by the Palace, in conjunction with B–95, and the station's FM frequency of 95.1.

Joseph Wayne Stephens, Jr., testified that he considered himself to be a fairly regular patron of B–95 Ladies Night at the Palace. He testified that Thursday was mainly the only night he ever went because "it was cheaper drinks, and you had a better time." Every time that Stephens attended the Palace on B–95 Ladies Night, he became intoxicated. On the night of June 30–July 1, 1988, Stephens was served 16–17 rum and coke alcoholic drinks by the same bartender, Joey Dartez. According to Patsy Denby Mason, around 1:00–1:15 a.m. that night, Stephens was seen stumbling and bumping into both people and things, exhibiting signs of being highly intoxicated. Another witness testified that Stephens was obviously intoxicated on this particular night, further testifying that he had seen Stephens intoxicated at the Palace on other occasions. Stephens' mother, Linda Nell Willis, was also called to testify, and stated that she arrived at the Palace on the night in question at approximately 11:30 p.m. or 12 midnight. Ms. Willis testified that at approximately 1:00 a.m., Stephens was seen staggering, and "walking like two steps to the right and two to the left." Ms. Willis further testified that Stephens was "staggering, belligerent, like—he couldn't walk. It was more like ... body slamming people.... He had no control."

During this same time-frame, another patron of the Palace, Michael Edward Poupart, was served approximately ten bar drinks and became intoxicated thereby. Poupart was underage for the purposes of being served alcoholic beverages. Upon leaving the Palace, Poupart was involved in a serious motor-vehicle accident at the forty-three hundred block of the Eastex Freeway, at approximately 2:00 a.m. According to police investigation Poupart's accident was caused by Poupart's intoxication.

The Poupart accident was investigated by Officer Chris Padgett of the Beaumont Police Department. Officer Padgett requested backup to assist in directing traffic and appellants, Officers James R. Riley and Mary Gray took up positions approximately 300–400 yards to the north of the Poupart accident. Officers Riley and Gray established a flare pattern, and started directing traffic off the freeway.

Meanwhile, Joseph Wayne Stephens, Jr., left the Palace at the 2:00 a.m. closing time. Mr. Stephens entered into his 1979 AMC Concord, and proceeded down the Eastex Freeway toward his home in Vidor, Texas. Stephens was traveling at a high rate of speed when his vehicle glanced off another vehicle that was stopped in the traffic and then struck Officers Riley and Gray with his vehicle. Stephens' vehicle left 155 feet of skid marks. When Stephens was checked at St. Elizabeth Hospital for a blood-alcohol level, such level was determined to be 0.28 percent. A subsequent bloodtest by the Jefferson County Regional Crime Lab produced a result of 0.19 percent. According to the investigating officer, Stephens' intoxication was the cause of the accident.

Evidence was presented that in 1982, Radio Station KZZB–95 FM was a new station with a new format. Rocky Chase was a salesman for B–95, and was involved in efforts to promote B–95 and increase its position in the Beaumont market. Chase contacted Lynn Heathman, manager of the Palace, and talked with him about promoting B–95. It was B–95 which approached the Palace with its promotion idea. The Palace and B–95 agreed to a promotion, where on one night a week, the Palace would sell 95 cent drinks, in conjunction with B–95's radio frequency. The 95 cent drink price was suggested by the manager of the radio station. B–95's involvement originated for the purpose of promoting B–95 Radio Station, and creating awareness in the community that B–95 was a radio station on the air. There was a mutual benefit for both parties. It was important for the station to market itself and get its name out to the public. In the radio business, money is made by increasing ratings.

According to Lynn Heathman, one of the owners and officers of the Palace, the relationship between the Palace and B–95 continued until 1989. At one point the radio station was purchased by a group headed by Jerry Condra. The Condra group was more aggressive in promoting the station than the previous group. In this regard, Heathman testified as follows:

[The Condra group] provided more input into the types of promotions that we would do. They had a better group of creative people to write spots, to do commercials. They introduced the Super Bee Volkswagens. A lot of things that were conducive to getting the station to No. 1.

Condra and Heathman discussed the success of B–95 Ladies Night and its effect on B–95's rating. According to Heathman, Condra told him B–95 had become the number one station.

Regarding the promotional activities between the Palace and B–95, Heathman testified that they had two automobile giveaways. One was a 1984 Chevrolet Camaro, and the other was a 1988 Chevrolet Barretta which the Palace purchased through B–95. The first car give-away was suggested by B–95 and the second car give-away was suggested by the Palace. The car promotions were for the joint benefit of promoting B–95 and the Palace. To promote the car give-away, t-shirts were given away on B–95 Ladies Night, promoting the image of the automobile, B–95, and the Palace. The car was given away at the B–95 Ladies Night promotion, and B–95 personnel participated in the drawing. Heathman testified that B–95 designed and purchased these t-shirts and that the t-shirts depicted both B–95 and the Palace, same being distributed by the B–95 disc-jockeys who passed them out for free. B–95 also designed and distributed plastic beer mugs that promoted B–95 and the Palace. The beer mugs were distributed by B–95 on B–95 Ladies Night at the Palace.

With regard to the radio broadcasts promoting the B–95 Ladies Night function, B–95 personnel would develop the paid radio spots, which were then reviewed and approved by the Palace. B–95 would also broadcast promotional spots about B–95 Ladies Night for which the Palace was not allowed any input.

Heathman testified that when the drinking age changed from nineteen to twenty-one in September 1986, the Palace experienced a loss in sales. According to Palace manager, John Parks Hudnal, fifty percent of their crowd started going over to Louisiana where alcoholic beverages could be purchased at a younger age. In 1987, the Palace was determined to permit 18–20 year olds back into the club, in order to help build business. Heathman discussed this with B–95, who subsequently incorporated into the promotional spots the fact that 18–20 year olds were admitted to the club on B–95 Ladies Night. In Plaintiffs' Exhibit 92, a letter written by B–95's president and general manager, Curtis Condra, to Heathman on June 9, 1987, reference was made to the fact that B–95 was delighted to be an important part of the " 'Rebirth' of the Palace." According to Heathman, the rebirth of the Palace had reference to the rebuilding of the crowds, including the 18–20 year olds. Without question, B–95's Ladies Night was the biggest night of the week for the Palace. Heathman testified that he had discussions with B–95 about liquor responsibility.

John Parks Hudnall was manager of the Palace from February 1982 until October 1988. According to Hudnall, part of the agreement with the radio station was that if B–95 sponsored B–95 Ladies Night, then the drink prices would be 95 cents. From the Palace's standpoint, the promotion was developed to increase business for the Palace and this promotion was successful. Hudnall testified that B–95 was an important part of the B–95 Ladies Night promotion, because they "could not have had a B–95 Ladies Night promotion without KZZB–95." It was the most successful radio partnership the Palace had. In the words of Hudnall, he saw this as a "joint business venture" between the Palace and B–95, that benefited both parties. Both parties were identified as sponsoring the promotion and "the average person would think that B–95 and the Palace were putting this on."

Curtis Condra, president of KZZB–95, testified that B–95 identified the Ladies Night

function on Thursday night as "B–95 Ladies Night." Condra acknowledged that they could have advertised for the Palace without lending the name "B–95" to the event. Condra testified that B–95 did not have another continuous relationship with an advertiser that included a weekly event with the name "B–95" associated with it. Condra was aware that the phrase "B–95 Ladies Night" came to be associated with Thursday night at the Palace, acknowledging that he could understand how the live remotes broadcasted by the station would represent to their listeners that this was a B–95 happening or a B–95 event.

Plaintiffs' Exhibit 1 was a tape-recording of B–95 broadcasts on March 31, 1989. Evidence showed that the recorded broadcasts were typical of and had the same points as other live remotes. Excerpts of the B–95 broadcasts are as follows:

Singing: The top five at nine, number two, B–95.

Male voice: B–95's top five at nine. There you go at number two, Def Leppard and Rocket. That's the seventh release from the album "Hysteria" for Def Leppard. Of course, your number one song is coming up next right after this, but first, you know its B–95 ladies night at The Palace. Time to check in with Rosie Chance. Hey, baby?

Female voice: Thank you, Brandin. This is Rosie Chance. We're broadcasting live from The Palace tonight, and we want to see you out here. Tonight is B–95 ladies night, and that means ladies 21 and up, you get in the door absolutely free, there's no cover charge for you, and 18 and up, you are admitted so come on down and join us. Now, tonight there's 95 cent bar drinks, beer, and wine for the entire house all night long. Super Bee is going to be out here in just minutes, freebies to give away, and the B-jocks are going to be on hand also. We want to see you. It's Thursday night: That means it's B–95 ladies night at The Palace. Come see us. This is Rosie Chance, broadcasting live for B–95.

Male voice: What you see, what you hear, may never again be quite the same, hot new music mix, B–95.

Male voice: At your new music station, you got B. Shaw, 9:35, and that is Waterfront. It's called "Cry." Don't forget tonight is B–95 ladies night out at The Palace, and we got 95 cent bar drinks, beer and wine out there for everybody. Of course, ladies, if you are 21 and up, you don't need no money, just walk right in for free, okay? Super Bee is out there, Brant Thomas is spinning the hits. All the B-jocks are going to be there tonight, so go by and say "hi" to everybody, and I'll see you there after midnight. It's B–95 ladies night at The Palace.

Male voice: What it is, it's B–95's ladies night out at The Palace. Let's check in with Rosie Chance right now, for B–95 ladies night at The Palace.

Female voice: Thank you, Brandin. This is Rosie Chance. We're broadcasting live from The Palace tonight. It's a Thursday night; it is a B–95 ladies night. Come on out here and join the fun. We've got Super Bee on hand with free music to pass out, and also the B-jocks are out here. It is ladies night, B–95 ladies night which means ladies, if you are 21 or older, get dressed and get out here and join the fun, and if you are 18 or up, you get in the door too, so come on out and join us. Twenty-one and up in the door absolutely free, no cover charge, drink specials all night long like 95 cent bar drinks, beer and wine for the entire house and it's on all night long. It's B–95's ladies night, and we want you to come on out here and join us. This is Rosie Chance, broadcasting live for B–95.

\* \* \* \* \* \*

Male voice: Number three tonight, it is "I Like It" so get down on your knees—no, I'm just joking. Brandin Shaw with you, 10:20, and of course, B–95 ladies night at The Palace. Let's go out to Rosie Chance live and check her out. Hey, Rosie?

Female voice: Thanks, Brandin. This is Rosie Chance. We're broadcasting live from The Palace tonight, Thursday night. Did you forget? Every Thursday night, B–95's ladies night at The Palace. That means ladies, if you are 21 or up, get on down here and you get in the door absolutely free, no cover charge, it's not going to cost you a cent. On top of that, 95 cent bar drinks, beer and wine for the entire house all night long. Super Bee has arrived, Super Bee is passing out music as we speak, B-jocks are here, Tommy Richards is out here, Brant Thomas is out here spinning the tunes, and if you are 18 or older, you get in the door too, so come on, the line is forming. The crowd is getting here. We want to see your face at the place. This is Rosie Chance. We're broadcasting live from The Palace. This is Rosie Chance on B–95.

Male voice: Ladies night at The Palace. Let's go to her live. Hey, Rosie?

Female voice: Thank you Brandin. This is Rosie Chance. We're broadcasting live from the Palace tonight. It's a Thursday night. It is a B–95 ladies night. Come on out here and join the fun. We've got Super Bee on hand with free music to pass out, and also the B-jocks are out here. It is a ladies night, B–95 ladies night, which means ladies, if you are 21 or older, get dressed and get out here and join the fun, and if you are 18 or up, you get in the door too, so come on out and join us. Twenty one and up in the door absolutely free, no cover charge, drink specials all night long, like 95 cent bar drinks, beer and wine for the entire house all night long. It's B–95 ladies night. We want you to come on out here and join us. This is Rosie Chance, broadcasting live for B–95.

Male voice: Ladies night at The Palace happening right now, and you've still got time to make it out there. That's where I'm heading when I get off at midnight. Come out and say "hi" to me, all right? Don't forget 95 bar drink, beer and wine all night long, and we'll see you there. B–95 ladies night at The Palace tonight.

Patrons who were present at the Palace on the night in question testified about their impression of B–95's involvement in B–95 Ladies Night. Rodney Spoonemore, who was served between 10–15 beers on the night in question, testified that he listened to the broadcast and it was his impression that B–95 was sponsoring the Ladies Night party at the Palace.

Patsy Denby Mason testified that it was her perception that B–95 was "sponsoring a party or a night of the week for their patrons and their listeners." Mason further testified that "[a]s far as B–95's participation, ladies over 21 got in free, and I knew that was due to the radio station, and the drinks were 95 cents and my perception was that it was due to B–95."

John Hoyt Meyers testified that there was always a better crowd on Thursday nights and that the "Bee" would hand out B–95 bumper-stickers promoting the station and would also give away cassette tapes. Upon hearing the radio broadcast, Meyers testified that it was his impression that B–95 was going to be there and that B–95 was part of the Ladies Night program at the Palace.

Emma Finkenbiner testified that she heard of B–95 Ladies Night on the radio, and she thought the radio station was having a party at the Palace on Thursday night. Excerpts of Finkenbiner's testimony goes as follows:

Q. So you know that it was B–95 ladies night out at The Palace?

A. Uh-huh.

Q. I'm sorry.

A. Yes. I'm sorry.

Q. How did you know that?

A. Advertisement through the radio. We had been going there for a while, about every Thursday.

Q. How long would you say?

A. Oh, about a month straight, maybe.

Q. So you heard the advertisements on the radio?

A. Uh-huh.

Q. Okay.

A. Yes.

Q. What would they say?

A. B–95 ladies night, drinks free till 10:00.

Q. Okay. And you remember that?

A. From—yeah. Yes.

Q. So you specifically recall them advertising the prices on the radio?

A. It was either ladies drink free till 10:00 or half-price drinks, something like that.

Q. Okay. But you don't remember exactly what the advertisements said?

A. No.

Q. When did you decide to leave The Palace?

A. I couldn't tell you the time.

Q. Who did you leave with?

A. I remember leaving with Mike Poupart.

Q. Were you drunk at this time?

A. Yes.

Q. Was he drunk?

A. I don't know. I remember him taking me to the car. That's all I remember. After that I passed out.

Q. So then you left The Palace with Mike Poupart?

A. Right.

Q. Okay. Whose car did you leave in?

A. One of his friends.

Q. Do you know his friend's name?

A. Cal Dog.

Q. How did you know that it was Cal Dog's car?

A. Because I asked him whose car it was, and he said it was Cal Dog's.

Q. Okay. You didn't actually see this Cal Dog give Mike Poupart the keys?

A. No.

Q. What kind of car was it?

A. A Camaro or a Firebird.

Q. Do you recall if Mike Poupart was staggering or showing any signs of drinking?

A. He's the one that helped me out of The Palace. I don't remember anything.

Q. All right. What happened after you all got in the car?

A. I passed out. I don't know.

Q. What (sic) the next thing you remember?

A. Waking up in an ambulance.

Q. Were you on your way to the hospital at that time, when you woke up?

A. Yeah.

Plaintiffs' Exhibits 2 and 3 are photographs of the stamp on Joseph Wayne Stephens, Jr.'s, hand on the night in question. The stamp reads:

Ladies
B–95
Over 21.

Appellants, plaintiffs below, called Dr. Herbert Rotfeld, Associate Professor from Auburn University, as an expert in communications and advertising. According to Dr. Rotfeld, the relationship between the Palace and B–95 was what is known as a co-sponsorship, where a radio station works with an advertiser to promote a particular type of event. According to Dr. Rotfeld, the radio station is licensed by the Federal Communications Commission, while the Palace operates under a liquor license. In this connection, Dr. Rotfeld testified:

You have two licenses operating here that are in their own ways grants to operate in a narrow area, so they are both making use of each other's license opportunities. There are only so many bars in an area because of the license to sell liquor, and so many party-type places that are serving liquor. There are also only so many radio stations. The reason the federal government licenses radio stations is there are only so many frequencies available that can be used to broadcast time so in this way, the bar is making use of the radio station's license, an opportunity to broadcast its information, and the radio station is making use of the bar's license or its legal ability to have this type of party.

With regard to this particular case, Dr. Rotfeld testified that this co-sponsorship was unusual in duration:

... [T]he main point that struck me in the depositions that a—this was a co-sponsorship arrangement that existed from when it started, I believe, in 1982 to when it ended in 1990, was a weekly affair or almost weekly affair extending back eight years. It was almost an institution in the community, and that is what struck me as unusual. I have not seen any such relationship that was that constant, that consistent and that persistent over such a period of time.

Dr. Rotfeld was asked for his opinion regarding the relationship between the Palace and B–95 to which he responded as follows:

Q. In your opinion, did B–95 radio station and The Palace have a common purpose with regard to the promotion of B–95 ladies night at The Palace?

A. The common purpose would be to maximize attendance at ladies night. This was a desire by which they both would profit, not from any of the proceeds of ladies night directly, but The Palace hired B–95 in the hopes that it would maximize attendance at the bar, in turn maximize receipts and sales of drinks, and for The Palace's interest, if this relationship engenders high attendance, The Palace would be happy, keep hiring B–95.

The people that would come to the Palace would then hear the B–95 music, hear the B–95 name, associate the music with the party where they had a good time, with the station call numbers, and it is hoped by the station more of these people would listen to the station and increase its ratings.

Q. In this particular case, was B–95, the station itself, separate and apart from the advertising income, in your opinion, was B–95 benefitting from this co-sponsorship of B–95 ladies night at The Palace?

A. Very clearly. They benefit in the possible ratings increase from this association. They could be benefitting from the association that people make with this music and the label where they say they had a good time, and this type of promotion will make more people interested in listening to the station, which would allow them to charge more for advertising time to other advertisers.

Q. In your opinion, Dr. Rotfeld, under the facts of this case that you have seen, did B–95 radio station act as a responsible broadcaster in connection with its relationship with The Palace and the event known as B–95 ladies night at The Palace?

A. No, they did not.

Regarding the significance of the 95 cent drinks, Dr. Rotfeld testified:

Q. Mr. Kebodeaux asked you whether or not the fact that some of the drinks—or that the drinks at B–95 ladies night was 95 cents was the cause of the accident. What do you see the significance of the 95 cent drink price being?

A. That was the call letters of the station, so by having the 95 cent drinks, they were able to in the promotions talk about B–95, the people at the bar, they were able to talk about 95, and in radio the frequency is everything. I do not think it—well, it's generally stated by many people they don't remember call letters of their favorite TV stations, or these days of digital radios, the call letters of their favorite radio stations, but they know their numbers.

Q. And that would be the same for using the name B–95 ladies night, is that correct?

A. That is correct.

Brandin Shaw testified that he was a B–95 disc-jockey during the time in question and that he also worked as the Palace disc-jockey on Thursday nights. Even though Shaw was paid by the Palace on Thursday night, Shaw referred to himself as a "B-jock." Shaw was the club disc-jockey on June 30, 1988, the night of the accident in question. According to Shaw, he was aware that the Palace permitted 18 year olds to come into the club on B–95 night. He testified that he knew the 18–20 year olds consumed alcohol at the Palace because he saw them drinking "openly." Shaw also testified that he had seen intoxicated patrons being served alcoholic beverages "every-so-often." On those occasions

where Shaw observed underaged persons drinking alcohol, he never took any action to bring it to anyone's attention. Lynn Heathman testified that he would have expected the radio personnel to have brought such matters to his attention.

Shawn Stephens testified that he was at the Palace on the night in question. Shawn Stephens was the B–95 disc-jockey who made the live remote broadcast from the Palace. According to Stephens, he was at the Palace to help B–95 meet the terms of its contract with the Palace. Stephens testified that he would normally make announcements over the PA system, talking about drink specials and what he was going to give away. Stephens also welcomed the customers to the Palace "[o]n behalf of the Palace and B–95." Stephens testified, "Of course, I would encourage customers to come to the bar." Stephens testified that every week he would call the manager of the Palace and discuss what the Palace was going to do and what B–95 was going to do, such as give-away's. They would also do "little off-the-wall things" like a mid-New Year's Eve Party or fiscal new year party. Stephens periodically met with Lynn Heathman to get his opinion on how things were doing, getting Heathman's opinion on how he thought B–95 was doing. Regarding the effect of the change in legal drinking age, Stephens testified that, "At the time they passed the law where you had to be 21 to drink, the business in the clubs dropped by quite a bit; and the whole idea of this was to try to build the business back up." Stephens testified that he saw people become intoxicated at the Palace and that he saw people to be under age who were drinking intoxicating beverages. Stephens took no action to bring these matters to anyone's attention. Stephens was terminated from B–95 stating that he believed his termination was as a result of the accident made the basis of this suit. According to Stephens, after the accident, the station manager, Jerry Condra, seemed worried about a lawsuit involving the accident in which the officers were hurt, and wanted Stephens to make a tape that did not exist, and swear that it was the tape that ran on the date in question. Stephens refused to make the tape, and

shortly thereafter, he was terminated. We set forth a portion of Stephens' testimony:

Q. Why did you leave B–95?

A. I was terminated from B–95.

Q. For what reason?

A. I never really got a sound reason. In my opinion, it concerned this incident.

Q. This incident?

A. Yes.

Q. Why is that?

A. Mr. Jerry Condra had asked me to construct a set of tape of spots for The Palace, and to swear that they were the ones that ran on the dates in question. I did not do or make such a tape. Shortly after that, I was terminated.

Q. So, he asked you to make tapes?

A. I don't think that he had anything to worry about. He was simply wanting something he could show; but, you know, such a tape did not exist.

Q. I want to make sure I got that right. He wanted you to make some tapes and say that they were run—

A. That they were the commercials that ran on the dates in question.

Q. Do you know—okay. He specifically talked with you about the night the two police officers were hurt?

A. He didn't specifically say anything about it. He simply mentioned the incident and told me that the station was— was named in a suit. At one time, I came downtown and talked with an attorney with him, but I never made those tapes and I simply refused to do so.

Q. Do you know who the attorney was you met with?

A. I have no earthly idea.

Q. Do you know where his office was?

A. It might have been right in this very room. I really don't know.

Q. You said that it was when they had been named in a suit?

A. Uh-huh. He informed me they had been named in a lawsuit.

Q. Suit in this—this case, as I recall, was filed in 1989; but you were terminated sometime in 1988?

A. All I know is what he told me. He may have been coming down here to protect his butt. I don't know.

Q. Okay. You feel like you parted ways with—that you had a negative parting of the ways with B-95?

A. Yes, yes. In fact, I applied for unemployment and he refused to let me have it, and I made a little bit of a stink and got it anyway. I do not like the man at all. . . .

At the conclusion of the evidence, the Plaintiffs submitted Plaintiffs' Requested Jury Question G as follows:

QUESTION NO. ___

On the occasion in question were The Cowboy Palace, Inc. and Radio Station KZZB-95 FM engaged in a joint enterprise?

A "joint enterprise" exists if the parties concerned have (1) an agreement, either express or implied, with respect to the enterprise or endeavor; (2) a common purpose; (3) a common business or pecuniary interest; and (4) an equal right to direct and control the enterprise.

ANSWER "Yes" or "No."

ANSWER: ___

The trial court refused to submit the jury question on the theory of joint enterprise.

Prior to the entry of judgment, the Plaintiffs filed a Motion for Judgment Non Obstante Veredicto against Triplex and B-95, contending that the evidence established a joint enterprise as a matter of law. The trial court denied Plaintiffs' Motion for Judgment Non Obstante Veredicto.

Appellants bring to this Court eight points of error to which appellees respond by 18 reply points.

We begin with an address to the issue of "joint enterprise." Appellants' points of error one and two contend trial court error, first, in failing to submit the joint enterprise question to the jury and, second, that the trial court erred in failing to grant motion for judgment non obstante veredicto, for reason that the evidence established a joint enterprise as a matter of law.

■ Appellants' second point of error is somewhat misplaced as it alleges trial court error in failing to grant appellants' Motion for Judgment Non Obstante Veredicto. As no question was submitted to the jury regarding the joint enterprise issue, no verdict was rendered for which the trial court could overturn. However, a trial court may render judgment non obstante veredicto if a directed verdict would have been proper. *Fort Bend County Drainage Dist. v. Sbrusch,* 818 S.W.2d 392 (Tex.1991); TEX.R.CIV.P. 301. In the instant case, appellants did not move for directed verdict at any point during the trial. As such, appellants have failed to preserve point of error two for appellate review. TEX. R.APP.P. 52(a). Point of error two is overruled.

■ In 1974, our Texas Supreme Court set forth the elements of a joint enterprise as follows:

(1) an agreement, express or implied, among the members of the group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose, among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control.

*Shoemaker v. Estate of Whistler,* 513 S.W.2d 10, 16–17 (Tex.1974).

BLACK'S LAW DICTIONARY 838 (6th ed. 1990), defines joint enterprise as follows:

The joint prosecution of common purpose under such circumstances that each has authority express or implied to act for all in respect to the control, means or agencies employed to execute such common purpose. The necessary elements are: (1) an agreement among the group's members, either express or implied; (2) a common purpose that the group intends to carry out; (3) community of pecuniary interest among members of the group in that purpose; and (4) an equal right to a voice in control and direction of the enterprise which gives an equal right of control.

We view these four elements as requiring the conjunctive link of each by one seeking to prove the existence of such enterprise.

From evidence previously cited we hold that appellants raised the issue of a joint enterprise between the Palace and appellees, Triplex Communications, Inc., and Radio Station KZZB–95 FM.

The first element of *Shoemaker* as to an agreement, express or implied among the members of the group, is clearly raised from the evidence set forth. We focus particularly on that part of the record which showed KZZB–95 FM to be a new station when its relationship with the Palace began in 1982. Rocky Chase was a salesman for B–95 and was involved in efforts to promote B–95 and increase its position in the Beaumont market. In pursuit of this effort, Chase contacted Lynn Heathman, manager of the Palace, to discuss the promotion of B–95. It was B–95 which approached the Palace with the promotion concept. The Palace and B–95 agreed to a promotion, where, on one night a week, the Palace would sell 95 cent drinks, in conjunction with B–95 radio frequency. It is obvious from the record that the relationship between the Palace and B–95 was designed to be, and in fact was, for the mutual benefit of promoting both B–95 and the Palace.

 The common purpose requirement under *Shoemaker* is also abundantly clear from the evidence. The ultimate end result for both enterprises was to make money. To that end, the common purpose engaged in by both enterprises was the *successful promotion* of "B–95 Ladies Night." To the Palace, "successful promotion" of B–95 Ladies Night meant increased profit as the establishment would be *filled to overflowing* with thirsty patrons purchasing "95 cent beer, wine, and mixed drinks" hand over fist. To B–95 radio station, "successful promotion" of B–95 Ladies Night also meant increased profit in a dual sense. First, so long as their promotion of ladies night at the Palace was successful, the Palace would most likely remain a steady paying customer. Second, other businesses, seeing what B–95 did for the Palace, would want to jump on the B–95 advertising band wagon and become paying customers as well. In short, it was the combining of these two enterprises which allowed each the opportunity to increase their respective markets. To this *joint enterprise* both

the Palace and B–95 brought together their respective talents, properties, goods, wares, and licenses to effectuate a common purpose of bringing larger crowds of drinking patrons to the Palace. Dr. Herbert Rotfeld testified that the relationship between the Palace and B–95 was a "co-sponsorship arrangement . . . a weekly . . . affair . . . extending back eight years. It was almost an institution in the community, and that is what struck me as unusual." Considering all the evidence, we conclude that the common purpose requirement was met. That common purpose was to make money through the sale of alcoholic beverages by the Palace and the persistent soliciting of patrons to purchase these beverages by B–95, creating a community of pecuniary interest between the Palace and B–95.

The evidence showed that B–95 and the Palace worked together in putting on B–95 Ladies Night at the Palace. These two entities coordinated car give-aways, B–95 t-shirts and mug give-aways. Both the Palace and B–95 had an equal right to a voice in the creativity and direction of the enterprise which enured to their mutual benefit. John Parks Hudnal, Manager of the Palace, testified unequivocally that he saw this as a "joint business venture" between the Palace and B–95, and that it was the most successful radio partnership the Palace had.

Appellees contend that there is no evidence that B–95 had an equal right of control over the provision, sale, or service of alcoholic beverages to the patrons of the Palace; or the admission and ejection of patrons; and, there was no common pecuniary interest in the sale of alcoholic beverages. Appellees further argue that the compensation of B–95 was not dependant upon the volume of sales of alcoholic beverages at the Palace. It is appellees contention that "[a]n equal right to direct and control the conduct of the enterprise" is an essential element of a joint enterprise, citing *Shoemaker, supra,* 513 S.W.2d at 14.

Beginning in 1986, when B–95 was purchased by a group headed by Jerry Condra, the new owners became more aggressive in promoting the station than the previous owners. According to Lynn Heathman, the new group provided more in-put into the types of

promotions that could be done. Evidence of record shows that B–95 personnel would develop the paid radio spots which were then reviewed and approved by the Palace. We think the testimony of Lynn Heathman to be highly probative on the issue of equal right to direct and control the conduct of the enterprise. Regarding the advertisements in promotion of the Palace and Radio Station B–95, some promo spots were reviewed and approved by the Palace, however, there were also promo spots broadcast by B–95 which did not allow in-put from the Palace. Heathman referred to these spots as "bonus spots." These so-called "bonus spots" were made each week to promote the fact that B–95 was going to be at the Palace and to invite everybody to come out.

 Generally, conception to the birth of a joint enterprise begins from common or mutual needs, most times economic in nature, which are best supplied through the combining of respective talents and resources, making possible the pursuit and accomplishment of mutually desired objectives. It is not a requirement that each member of a joint enterprise contribute identical offerings, for in many instances, it is the diversity of offerings by members to the enterprise which brings success or failure to the ultimate purpose and goal. To show a community of pecuniary interest does not require a showing that each member of the enterprise received their respective benefits from the same cash register. We find it compelling, that when legal drinking age changed in Texas, from 19 to 21 years, the Palace lost approximately fifty percent of its patronage. According to the evidence, this staggering reduction in customers was due to the fact that 18 through 20 year olds could legally buy alcoholic beverages in the State of Louisiana. The Palace and B–95 determined that the best means of recapturing those lost patrons would be to advertise that persons under the age of 21 years were welcome to the Palace and that there were, "95 cent bar drinks, beer and wine *for the entire house.*" (emphasis ours)

It was the combined efforts, talents, and the respective licenses of the Palace and B–95 which made "B–95's Ladies Night at the Palace" a successful enterprise for both B–95 and the Palace for a period of approximately eight years. B–95 offered to the enterprise, its talent for reaching the public, encouraging the public's attendance and encouraging the purchase and drinking of alcoholic beverages. B–95 openly encouraged those people of legal drinking age and those younger than legal drinking age to attend "B–95's Ladies Night at the Palace." Even the price of the drinks on B–95's Ladies Night at the Palace, were logo priced, i.e., 95 cent drinks. We do not believe it overreaching to conclude from the evidence that B–95 actually encouraged those patrons of non-legal age to drink alcoholic beverages. To emphasize this fact we repeat from previous recited evidence. Rosie Chance, an employee of B–95 in a promo spot announced:

> This is Rosie Chance, we're broadcasting *live* from the Palace tonight, and we want to see you out here. Tonight is B–95 Ladies Night, and that means ladies 21 and up, you get in the door absolutely free, there's no cover-charge for you, and 18 and up, you are admitted *so come on down and join us.* Now, tonight there's 95 cent bar drinks, beer, and wine *for the entire house....* (emphasis ours)

Michael Edward Poupart apparently took the B–95 advertisement literally, in that Mr. Poupart was in attendance at the Palace on the night in question; was under the legal drinking age; was served several "bourbon and seven or bourbon and Coke" drinks; was continually served alcoholic beverages throughout the evening without having to verify his age; and left the Palace in a state of intoxication sufficient to cause the automobile accident in which he was involved. Mr. Poupart testified:

Q. On B–95 night, in particular on June the 30th, 1988, when you were out there, did it seem sort of like a party atmosphere—

A. Yes.

Q. —in The Palace?

A. Yes.

Q. Whose party did it seem like it was?

A. B–95.

Q. Did their promotional advertisements over the radio give you that impression, as well?

A. Yes.

Q. Mr. Kebodeaux asked you some questions about who you felt was responsible for this accident and the injuries that these officers suffered. Do you feel like the business establishment that served you as an underaged person, ten alcoholic beverages that night, bore any responsibility for your accident?

MR. KEBODEAUX: Object to the form of the question.

A. Do I think that it is their fault?

Q. Do you feel that they should have served you, you being underaged?

A. No.

Q. Do you feel like if they would not have served you ten alcoholic beverages with you being underaged, that you would have even had that accident that night?

A. I wouldn't have, no.

Q. Do you feel that the fact that you had those ten drinks was a cause of the accident?

A. Yes.

Q. You mentioned that Kyle was there at the table with you, and Mr. Kebodeaux asked you what Kyle may or may not have seen or observed with regard to your behavior. But Kyle had been drinking, too, hadn't he?

A. Yes, sir.

Q. Did he drink about as much as you drank?

A. It's possible. I really didn't keep up with him.

Q. Everybody was pretty much drinking throughout that period of time, weren't they?

A. Yes.

Q. The other people at the table were drinking, as well?

A. Yes.

Q. Did the same waitress serve you the ten drinks?

A. I don't think so.

Q. Do you know how many different waitresses served you?

A. No.

Q. Did any waitress ask you how many drinks you had?

A. No, sir.

Q. Did you ever hear an advertisement to the effect that said, 'Ladies, come on out to B–95 night. If you are 21 and up you get in the door absolutely free, and if you are 18 or up, you come out and you get in the door, too; so, come join us'?

A. I guess I heard something like that because I went. I know I wasn't 21 at the time.

Q. You heard something on the advertising to the effect that if you were 18 to 20 you could still get in the door—

A. Uh-huh.

Q. —is that right?

A. Yes.

Q. Was that a factor in your going out there?

A. Probably so.

Q. Do you know if you were staggering or not that night?

A. No, sir, I don't.

Q. Do you feel like somebody who would have looked at you immediately after this accident would be in a better position to say what your condition was?

A. Probably one of the bouncers, yes, if they wasn't drinking.

Q. How close to closing time did you— were you served your last drink? Your best estimate.

A. I guess within—within 30 minutes before I left.

Q. All right. That would make it about 1:30?

A. 1:30, approximately.

■ It would be difficult to conjure a more appropriate factual scenario to which the legal concept, meaning, and definition of joint enterprise would apply. We find that evidence exists in the record before us that sufficiently raises the issue of the existence

of a joint enterprise between B–95 and the Palace at the time Officers Riley and Gray were seriously injured. Appellants were entitled to have the jury provided with said issue. We sustain appellants' first point of error.

Appellants' points of error four and five address the submission by the trial court of Jury Question No. 4 relating to "civil conspiracy." Regarding "civil conspiracy" the trial court submitted the following Jury Question:

## QUESTION NO. __4__

At the time in question, were The Cowboy Palace, Inc. and Radio Station KZZB–95 FM engaged in a civil conspiracy which resulted in the injuries to the Plaintiffs?

A "civil conspiracy" is a combination of two or more persons who agree between themselves to accomplish an unlawful or negligent purpose or to accomplish a lawful purpose by unlawful or negligent means. To establish a civil conspiracy, there must be a meeting of the minds on the object or course of conduct, one or more overt acts in furtherance of the conspiracy, and a preconceived plan and unity of design and purpose to engage in the course of conduct that results in an injury to another.

ANSWER: "Yes" or "No"

ANSWER: ____

Appellants, plaintiffs below, made their objection to Jury Question No. 4 for reason that the definition of civil conspiracy given by the trial court failed to comply with the law as required in the case of *Rogers v. R.J. Reynolds Tobacco Co.*, 761 S.W.2d 788 (Tex. App.—Beaumont 1988, writ denied).

Appellants tendered Plaintiffs' Requested Jury Question I as follows:

## QUESTION NO. ____

At the time in question, were The Cowboy Palace, Inc. and Radio Station KZZB–95 FM engaged in a civil conspiracy in a course of conduct which resulted in the injuries to the Plaintiffs?

You are instructed that a "CIVIL CONSPIRACY" exists when two or more parties consciously or knowingly agree among themselves, or otherwise combine together to engage in a lawful purpose or known course of conduct, and perform some acts to implement the course of conduct by some unlawful means.

The term "unlawful means" may include negligence or the violation of a statute or law. It is not necessary that all co-conspirators engage in unlawful means.

ANSWER "Yes" or "No."

ANSWER: ____

The trial court overruled plaintiffs' objection to Jury Question No. 4 and also refused plaintiffs' requested Jury Question I. The jury determined under Question No. 4 that the Palace and B–95 were not engaged in a civil conspiracy. Appellants contend that judgment non obstante veredicto should have been granted by the trial court in that the evidence established a civil conspiracy as a matter of law.

In 1988, this Court of Appeals clarified the law of civil conspiracy by concluding that under Texas law, there can be a conspiracy to be negligent. *Rogers, supra,* 761 S.W.2d at 796. The issue in *Rogers* was whether non-supplying cigarette manufacturers and other associations and entities could be held liable on a theory of civil conspiracy. *Id.* In *Rogers,* this Court reviewed our Texas Supreme Court's opinion in *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.,* 435 S.W.2d 854 (Tex.1968), and noted the following:

We conclude that a correct analysis of *Schlumberger, supra,* makes it clear that the Supreme Court was *saying only* that conspirators must intend to engage in the course of conduct that results in the injury and that the course of conduct must be known to them. The liability may then be joint. The course of conduct need not be to commit an intentional, separate, underlying tort. *Schlumberger, supra,* stands for the proposition that a person, or defendant, cannot *inadvertently become a member of a civil conspiracy.* Indeed, he or it must consciously and knowingly combine with others to engage in an intended course of conduct and perform some acts to implement the intended course of conduct and set it on its way. Thus, we

conclude that the course of conduct, itself, agreed to by the civil conspirators, does not have to involve a separate, distinct intentional tort to impose civil liability. (emphasis in original)

*Rogers, supra,* 761 S.W.2d at 797.

In the case before us the evidence raises the possibility that defendants below, Cowboy Palace Inc., and Radio Station KZZB–95 FM, consciously and knowingly engaged in a course of conduct and activity known as B–95 Ladies Night at the Palace, which became a regular weekly event over a period of time spanning several years. This particular event became a well known and well publicized weekly occurrence in this community. B–95 and the Palace consciously and knowingly combined together in the intended course of conduct, each performing certain acts to implement the intended course of conduct which made B–95 Ladies Night at the Palace a successful business endeavor.

■■■■ The trial court incorrectly required the jury to find that the Palace and B–95 *intended* to "accomplish an unlawful or negligent purpose or to accomplish a lawful purpose by unlawful or negligent means." We believe a proper submission only requires that the parties intend to engage in a course of conduct as opposed to an intent to accomplish an ultimate unlawful or negligent result. The trial court also erroneously required that there be a "preconceived plan and unity of design and purpose to engage in the course of conduct that results in an injury to another." Such definition required the jury to find that the Palace and B–95 *agreed* that their specific conduct would be unlawful or negligent. The trial court's definition erroneously overstates the *Rogers* requirement by implying a standard required for criminal conspiracy.[1] Civil conspiracy only requires that the conspirators intend to engage in a course of conduct and perform some act or acts in furtherance thereof. Where, in the implementation of this intended course of conduct, a separate underlying tort is committed, the co-conspirators are jointly liable. Points of error *four and* five are sustained.

1. *See* TEX. PENAL CODE ANN. § 15.02 (Vernon 1974).

Because we have sustained points of error four and five, we decline to address points of error three and six as these two points require our reviewing the findings of the jury to some greater or lesser degree. An examination on our part of the jury's findings on the civil conspiracy issue could only mirror the taint of said findings because of the erroneous charge on said issue.

■■■ In point of error seven, appellants contend that the trial court erred in failing to submit "Plaintiffs' Requested Jury Questions E and F," inquiring as to the Palace's violation of TEX.ALCO.BEV.CODE ANN. § 101.63 (Vernon 1978), and appellee's culpability as a "party to the offense" under TEX.PENAL CODE ANN. § 7.02(a)(2) (Vernon 1974). Questions E and F are reproduced from the transcript before us as follows:

Jury Question E

Under Section 101.63 of the Texas Alcoholic Beverage Code, it is unlawful for a person to knowingly sell an alcoholic beverage to an intoxicated person.

QUESTION NO. ——

On the evening in question, did the Cowboy Palace, Inc., acting by and through its employee, Joey Dartez, violate Section 101.63 of the Texas Alcoholic Beverage Code by serving alcoholic beverages to Joseph Wayne Stephens, Jr.?

ANSWER "Yes" or "No."

ANSWER: ——

Jury Question F

If you have answered Question No. —— "Yes," then answer Question No. ——; otherwise do not answer Question No. ——.

QUESTION NO. ——

On the occasion in question, did Radio Station KZZB–95 FM act with intent to promote or assist the Palace's violation of Section 101.63, and encourage, aid, or attempt to aid The (sic) Palace in violating Section 101.63. (sic)

ANSWER "Yes" or "No."

ANSWER: ____

TEX.R.CIV.P. 278 provides, *inter alia,* that failure to submit a question shall not be deemed a ground for reversal of the judgment, unless its submission, in substantially correct wording, has been requested in writing and tendered by the party complaining of the judgment. TEX.ALCO.BEV.CODE ANN. § 2.02 (Vernon Supp.1994) provides a cause of action by an injured party against a provider, seller, or server of an alcoholic beverage to an obviously intoxicated individual so long as the recipient's intoxication can be proven to be the proximate cause of the damages suffered by said injured party. TEX.ALCO.BEV.CODE ANN. § 2.03 (Vernon Supp.1994) provides, however, that Chapter 2 of the Alcoholic Beverage Code "provides the exclusive cause of action for providing an alcoholic beverage to a person 18 years of age or older." We find that appellant's Questions E and F, *couched in terms of § 101.63 of the Alcoholic Beverage Code* were not "in substantially correct wording" as § 2.03 expressly preempts the field as to any cause of action involving the selling, providing, or serving of an alcoholic beverage to an intoxicated person. To have been considered proper, appellants' Questions E and F should have omitted any reference to § 101.63 and its language, and used the provisions contained in § 2.02. Point of error seven is overruled.[2]

Appellants' point of error eight contends that the trial court erred in failing to submit Plaintiffs' Requested Jury Questions B and C, inquiring as to Radio Station KZZB-95 FM's negligent promotion of B-95 Ladies Night at the Palace.

Texas Courts have yet to recognize a cause of action for "negligent promotion." Appellees contend that, "[t]his is a liquor liability case." Appellees also state that Texas Courts recognize only a cause of action against the seller, server or provider of alcohol; that to permit the imposition of liability

in this case under the rubric of negligent promotion would conflict with these authorities; that such decision would also conflict with the intent of the Legislature in adopting Chapter 2 of the Texas Alcoholic Beverage Code; that the Legislature clearly sought to impose civil liability on sellers, servers or providers of alcohol, and not those engaged in advertising or promotion.

We do not believe that our State Legislature intended to create a "Catch-22" for first parties or third parties who may be harmed, through or by, the negligent promotion of the purchase of alcoholic beverages. Regarding first parties *see Smith v. Sewell,* 858 S.W.2d 350 (Tex.1993).

Further, we do not believe that our Legislature, through the enactment of Chapter 2, Texas Alcoholic Beverage Code, intended the exoneration of non-providers and non-sellers of alcoholic beverages, who through possible joint enterprise or through possible civil conspiracy, become so interrelated with such providers or sellers, as to defy distinction of conduct and purpose. Such is the case before us, for, lingering still is the question, "Whose party was it?"

The facts of this present appeal are no doubt peculiarly unique to normal advertisement and promotional concepts. In advertising or promoting, seldom is seen such comingling, intertwining and common pursuit of purpose.

To accept appellees' argument would totally remove any and all responsibility on the part of advertisers promoting the purchase of alcoholic beverages. The intended purpose of B-95 in advertising its, "B-95 Ladies Night at the Palace," cannot simply be viewed as an effort to assist the Palace in the sale of alcoholic beverages. B-95's advertisement was directed towards the inducement of Palace patrons to purchase alcoholic beverages irresponsibly. We find a distinction between a promotion of the "sale of alcoholic beverages" and advertisement encouraging the *unrestrained and uncontrolled*

---

**2.** Appellants contend that Section 2.03 of the Texas Alcoholic Beverage Code is unconstitutional in that it violates the open court provision of Article I, Section 13 of the Texas Constitution, citing *Nelson v. Krusen,* 678 S.W.2d 918 (Tex.

1984). We choose not to address this constitutional question in that appellants have failed to properly assert same by point of error. TEX. R.APP.P. 74(d).

*purchase* of alcoholic beverages. Arguably, the promoting of the purchase of alcoholic beverages so implies the sale of such beverages as to make the sale and the purchase of alcoholic beverages indistinguishable. We believe, however, that a distinction is clear under the facts of the present case. Our review of the record compels our conclusion that the entirety of B–95's promotional activities regarding B–95 Ladies Night at the Palace was geared and directed to the inducement of patrons, not merely to patronize the Palace but also to purchase and consume as many alcoholic beverages as time would permit. This encouragement to mindlessly purchase alcoholic beverages was directed to both legal age patrons and non-legal age patrons, and in whatever state of intoxication. B–95 Ladies Night at the Palace was perceived as a party hosted by B–95.

Query: Did B–95 have a duty to Officers Riley and Gray to responsibly promote their Thursday night party, i.e., in a manner as to avoid foreseeable injuries resulting to these two officers?

 Generally, there is no duty to control the conduct of third persons. *Otis Engineering Corp. v. Clark,* 668 S.W.2d 307 (Tex. 1983); Restatement (Second) of Torts § 315 (1965); reaffirmed in *Greater Houston Transportation Co. v. Phillips,* 801 S.W.2d 523 (Tex.1990).

This general rule does not apply when a special relationship exists between the actor and the third person which imposes a duty upon the actor to control the third party's conduct. *Phillips* at 525; *Otis* at 309; Restatement (Second) of Torts § 315(a) (1965).

 Common law negligence requires proof of three elements: 1) a legal duty owed by one person to another; 2) a breach of that duty; and 3) damages proximately resulting from the breach. *Phillips, supra,* at 525; *El Chico Corp. v. Poole,* 732 S.W.2d 306, 311 (Tex.1987). The threshold inquiry in a negligence case is duty. *El Chico, supra,* at 311. It is incumbent upon the plaintiff to show both the existence of a duty and a violation thereof. Whether a duty exists is a law question for the court to determine from facts surrounding the occurrence in question. *Phillips, supra,* at 525.

 To determine duty, a court will consider several interrelated factors, including the risk, foreseeability, and likelihood of injury weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant. *Phillips, supra,* at 525. Of all these factors, foreseeability of the risk is "the foremost and dominant consideration." *Phillips, supra,* at 525; *El Chico, supra,* at 311. Prior to liability being imposed, there must be sufficient evidence indicating that the defendant knew or should have known that harm would eventually befall a victim. *Phillips, supra,* at 526. In *El Chico,* duty was imposed upon the alcoholic beverage licensee not to serve alcohol to patrons when the licensee knew or should have known that the patron was intoxicated. *El Chico, supra,* at 314.

 In our case, it was reasonably foreseeable to B–95 that patrons would respond to B–95's "encouragement" to purchase alcohol. It was reasonably foreseeable to B–95 that its continuous, on the scene promotional bombardment, would encourage patrons to drink more on Thursday night than they perhaps normally would, due to cheap drink prices. It was reasonably foreseeable to B–95, that through its continued encouragement, patrons would drink irresponsibly to the point of intoxication. It was reasonably foreseeable to B–95 that intoxicated customers would leave the Palace by automobile, driving same while under the influence of alcohol or thoroughly intoxicated thereby. It was reasonably foreseeable to B–95 that intoxicated drivers leaving the Palace would or could constitute a risk of harm to others or property.

Now, we weigh these reasonably foreseeable risks against the social utility of B–95's conduct.

For purposes here, we shall approach the subject matter in question form: What socially useful and redeeming purpose, regarding B–95's promotion of 95 cent drinks at the Palace, deserves a higher degree of protec-

tion than that of the reasonably foreseeable consequences of intoxicated drivers traversing public streets, roads and highways? Does there exist any redeemable social utility in advertisement which encourages irresponsible drinking via inexpensive alcoholic beverages whether those persons are of legal age or not? We question the existence of social utility favoring an actor, such as B–95, who promotes and encourages the violation of criminal law, i.e., encourages those already intoxicated to drink more, and solicits attendance by non-legal drinking age patrons with promises that there are bar drinks, beer and wine for the entire house.

For similarity, we reference the case of *Braun v. Soldier of Fortune Magazine, Inc.*, 968 F.2d 1110, 1122 (11th Cir.1992).

In *Braun*, the sons of a murder victim brought a wrongful death action against Soldier of Fortune Magazine, Inc., and its parent company, alleging that defendants negligently published an advertisement that created an unreasonable risk of solicitation of violent criminal activity. The jury awarded $2 million as compensatory damages on the wrongful death claim; $375,000 compensatory damages for shooting injuries and $10 million in punitive damages for personal injury claim. The trial court remitted the punitive damage award to $2 million and the magazine appealed.

The Eleventh Circuit Court in affirming the judgment determined:

> ... (1) magazine publisher could be liable only if advertisement on its face would alert reasonably prudent publisher to clearly identifiable unreasonable risk of harm to public posed by advertisement; (2) imposing liability on magazine for publishing advertisement that on its face created clear risk of substantial danger of harm to the public did not violate the First Amendment; and (3) sufficient evidence sustained jury determination that publication of ad was proximate cause of injuries to plaintiffs.

*Braun, supra,* at 1110.

The Court held:

> A risk is unreasonable if it is "of such magnitude as to outweigh what the law

regards as the utility of the defendant's alleged negligent conduct." *Johnson [v. Thompson ]*, [111 Ga.App. 654] 143 S.E.2d [51] at 53. Simply put, liability depends upon whether the burden on the defendant of adopting adequate precautions is less than the probability of harm from the defendant's unmodified conduct multiplied by the gravity of the injury that might result from the defendant's unmodified conduct. *United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (2d Cir.1947).

*Id.* at 1115.

Generally, social utility, nebulous at times, is best viewed through consideration of the moral, social and economic values underlying the actors conduct, weighing those values, if any, against the alleged negligent conduct, then determining whether such conduct, though perhaps negligent, constitutes unreasonable conduct.

Here, we find no redeeming social utility and are thus left with the sole consideration of B–95's negligent advertisement and promotion, its proximate causation of the accident in question and resulting damages.

We find our present case analogous to *Weirum v. RKO General, Inc.*, 15 Cal.3d 40, 123 Cal.Rptr. 468, 539 P.2d 36 (1975), which we cite, not as authority, but for factual similarity and court reasoning.

The California Supreme Court determined that a radio broadcaster was liable for a motor-vehicle accident that resulted from its negligent promotion. The *Weirum* facts showed that the radio station, having a large teenage audience, engaged in a promotion entitled "The Super Summer Spectacular." In this promotion, a radio disc-jockey known as "The Real Don Steele," drove around Los Angeles in a conspicuous red automobile to a number of different locations. The first listener to physically locate "The Real Don Steele" and fulfill a specified condition would receive a cash prize. We set forth certain excerpts from *Weirum* regarding "The Real Don Steele's" broadcast:

> 9:30 and The Real Don Steele is back on his feet again with some money and he is headed for the Valley. Thought I would

give you a warning so that you can get your kids out of the street.

The Real Don Steele is out driving on—could be in your neighborhood at any time and he's got bread to spread, so be on the lookout for him.

The Real Don Steele is moving into Conoga Park—so be on the lookout for him. I'll tell you what will happen if you get to The Real Don Steele. He's got twenty-five dollars to give away if you can get it ... and baby, all signed and sealed and delivered and wrapped up.

10:54—The Real Don Steele is in the Valley near the intersection of Topanga and Roscoe Boulevard, right by the Loew's Holiday Theater—you know where that is at, and he's standing there with a little money he would like to give away to the first person to arrive and tell him what type car I helped Robert W. Morgan give away yesterday morning at KHJ. What was the make of the car. If you know that, split. Intersection of Topanga and Roscoe Boulevard—right nearby the Loew's Holiday Theater—you will find The Real Don Steele. Tell him and pick up the bread.

*Id.,* 123 Cal.Rptr. at 470, 539 P.2d at 38.

On the day in question, two teenage listeners were in their respective cars, listening to the radio station and searching for "The Real Don Steele." These two teenagers had almost been successful in finding Steele and claiming the prize, but someone else had gotten there first. Each driver, without knowledge of the other, tried to follow "The Real Don Steele," and be the first to claim the next prize. As these drivers were traveling down the freeway, jockeying for position, and reaching speeds up to eighty miles per hour, one of the teenage drivers forced a third party's vehicle off the roadway, where it went into a center divider, overturning and killing the driver. One of the teenagers involved stopped to report the accident; and the other teenager paused momentarily to relate the accident to a peace officer, then continued his pursuit of "The Real Don Steele," eventually succeeding in locating Steele and collected the prize.

In upholding a jury verdict against the radio station the California Supreme Court ruled that the radio station owed a duty to the decedent arising out of its broadcast of the give-away contest. In reaching its decision the Court reasoned:

These tragic events unfolded in the middle of a Los Angeles summer, a time when young people were free from the constraints of school and responsive to relief from vacation tedium. Seeking to attract new listeners, KHJ devised an "exciting" promotion. Money and a small measure of momentary notoriety awaited the swiftest response. It was foreseeable that defendant's youthful listeners, finding the prize had eluded them at one location, would race to arrive first at the next site and in their haste would disregard the demands of highway safety.

Indeed, "The Real Don Steele" testified that he had in the past noticed vehicles following him from location to location. He was further aware that the same contestants sometimes appeared at consecutive stops.

\* \* \* \* \* \*

It is of no consequence that the harm to decedent was inflicted by third parties acting negligently. Defendant invokes the maxim that an actor is entitled to assume that others will not act negligently [citation omitted]. This concept is valid, however, only to the extent the intervening conduct was not to be anticipated [citation omitted]. If the likelihood that a third person may react in a particular manner is a hazard which makes the actor negligent, such reaction whether innocent or negligent does not prevent the actor from being liable for the harm caused thereby [citation omitted]. Here, reckless conduct by youthful contestants, stimulated by defendant's broadcast, constituted the hazard to which decedent was exposed.

*Id.,* 123 Cal.Rptr. at 472, 539 P.2d at 40.

Striking similarities exist between the fundamental facts of *Weirum* and those of the case before us. Like the circumstances in *Weirum*, appellees super-saturated its listeners with attractive inducements (an endless supply of inexpensive alcoholic beverages for

those as young as 18 years of age) that would require some participants to operate motor vehicles in order to partake in the festivities. We are unpersuaded by the fact that the radio station in *Weirum* was the sole beneficiary of the negligent promotional activity. After a careful examination of the record in the instant case, can anyone honestly argue that appellee was merely a *conduit* for information to flow from the Palace *directly* to the public? For a period of several years, appellee knowingly created a situation where patrons would drive to the Palace in response to appellee's media-blitz of "B–95 Ladies Night." Once there, said patrons would continue to be encouraged by appellee's live, on-the-scene, promotional activities to irresponsibly overindulge in their consumption of alcoholic beverages. Thereafter, said patrons, at various levels of alcohol toxicity, many undoubtedly legally intoxicated, would get back into their automobiles and drive off down the highway posing a foreseeable risk of harm to innocent third persons such as Officers Riley and Gray.

We hold, therefore, that the evidence raised an issue of B–95's negligent promotion of B–95's Ladies Night at the Palace, and that it was error for the trial court to refuse to submit Plaintiffs' Requested Jury Questions B and C. Point of error eight is sustained.

AFFIRMED IN PART, REVERSED AND REMANDED IN PART.